The next case on for argument is Haar v. Allen v. Dairy Farmers of Vermont The next case on for argument is Haar v. Dairy Farmers of Vermont   The next case on for argument is Haar v. Dairy Farmers of Vermont Haar v. Dairy Farmers Joshua Haar Joshua Haar Joshua Haar Joshua Haar Joshua Haar Joshua Haar Joshua Haar Joshua Haar Joshua Haar Joshua Haar Joshua Haar Joshua Haar Joshua Haar Joshua Haar was spot on with this particular argument early on, she recognized, and Mr. Pearson went round and round with her on that point, that just because you say, yeah, I'll take the $2,000, doesn't mean that you have any opinion on the case, yay, nay, or otherwise. It means someone's offering you free money, is the way your average person is going to view that. I understand. Thank you. You're welcome. Thanks. Why don't we hear from the other side now, and then Joshua Haar will have an opportunity for two minutes to give any remarks and rebuttal that he wants to. And since this is your first appearance in court, you're in law school, just because you're offered time to talk as an attorney doesn't mean you have to take it. They usually do though. Yes. They usually do. Yes. As everybody here will tell you. Good morning, Your Honors. May it please the court, I'm Kit Pearson from Cohen Milstein. I represent the DFA, DMS, Farmer subclass. This case is in its eighth year of litigation. It was settled by very experienced trial counsel on the eve of trial after tenacious litigation by both sides that involved five million pages of discovery, 70 depositions, more than a and ultimately settled. The standards for review in this court are well established. The district court, as this court held in Sharon, is not reversed absent a clear showing of abuse of discretion. There are a few points I'd like to highlight here in terms of why this was a perfectly sensible decision by the district court judge, and certainly not an abuse of discretion in any respects. First, the settlement was negotiated by very experienced counsel. The counsel in this case on the plaintiff's side included Mr. Abrams, who you'll hear from later today, who's a member of the American College of Trial Lawyers. It included an attorney who had spent years at the FTC Bureau of Competition. It included a trial attorney from the Department of Justice. This was a serious settlement reached by serious lawyers on both sides. The district court concluded . . . there's no question the district court applied the proper legal test here, the Grinnell test, and concluded that eight of the nine Grinnell factors all supported this settlement. The only other factor was a neutral factor, that the defendant had resources to do more, which has been characterized as sort of . . . it's really a secondary factor in most cases. All of the factors pointed in a single direction. I'd like to focus on the questions that Mr. Haar focused on and the court asked some questions about relating to the reaction of the class. One threshold point I'd make, which I think is important and it's reflected in this court's decision in Charon, is at the end of the day, the district court's review and this court's review of a settlement agreement, it's not a plebiscite among class members. That's a factor. It's one of the Grinnell factors, but in Charon, for example, two-thirds of the letters that were submitted in Charon by the class members had opposed the settlement. All of the subclass representatives in that case opposed the settlement. Nevertheless, the court upheld the approval of the settlement, basically saying that the fundamental mission of the district court and the fundamental mission of the Court of Appeals on Review is to look at the terms of the settlement. What did they get? What were the risks of the case? Was it a good settlement? Was the district court correct that the average settlement per farm was about $4,000? I think that's right, Your Honor. I mean, it actually comes out more if the attorney fee is less. It's a zero-sum game in that respect, but that's a reasonable approximation. I think the most relevant aspect of the financial thing, the way the benchmark really in this case, in any class action case, is to look at what the potential single damages recovery would have been. And here, what the evidence showed was that you had a $50 million settlement on top of a $30 million settlement, so if the case had gone to trial, the $30 million would have been an offset against any recovery. So you had $80 million in recovery in this case versus single damages within the limitations period of $138.6 million. There was an argument for damages outside the four-year limitations period, which would have brought the single damages to about $230 million. So by any measure, this was a substantial financial settlement, and I think that's not really even . . . I don't think the adequacy of the financial settlement is really not even raised in the appeal. That doesn't seem to be the main objection, right? I agree with that. The main objection is to the equitable relief. I agree with that. And if I could comment just briefly on the Court's question about, were there indicia of support for this settlement? And the district court was right. The indicia were overwhelming. I mean, 90 percent of the letters that came in did support the settlement. Most of the letters that came in were form letters, either opposed . . . the HARS had been circulating a form letter opposing the settlement, there was a form letter circulated by DFA. So a lot of the letters were form letters. Ninety percent of them supported that. Even if you went back and did an ECF count and looked at the letters that were individually written, 90 percent of those supported the settlement. But there were other important indicia. The 85 percent claims rate, which is almost unprecedented in a class action settlement. It's certainly the highest I've seen on either the defense or the plaintiff side. You had a year-long campaign to try to get farmers to oppose the settlement, and yet other than the HARS, only three farmers showed up at the fairness hearing to oppose the settlement out of a class of about . . . subclasses of about 9,500 farmers. And while the HARS are passionate in their beliefs, and we respect that, the fact of the matter is there are eight other subclass representatives in this case who support the settlement. So most of the subclass representatives support the settlement. As you said earlier, the key thing is the reasonableness of the relief and whether this was a reasonable judgment. And I see your time is running down, and we haven't quite gotten to that. In this case, am I right that the district court had effectively rejected a prior settlement for the lack of equitable relief and sent the parties back to the drawing board for that? That may be an oversimplification. I think it's a little . . . a bit of . . . respectfully, a bit of an oversimplification. I think the district court was concerned, probably too concerned, in my view, about the reaction of the class. I think the district court's analysis in the first hearing, frankly, was a bit of an oversimplification, but that was clearly an important factor. There were issues about the release, which were subsequently addressed. The district court's primary concerns had to do with testing, a testing of milk, an settlement with DFA, and I don't think there's any really serious argument that the remedy that has now been placed for testing is an adequate remedy. I'm just . . . I guess my question is we're hearing this argument that the district court was sort of a tool, in a way, when it seemed to me on reading the record that the district court had been rather aggressive with respect to that first settlement in sending the parties back to do more. I completely agree with that, Your Honor. The one other observation I would make goes to Your Honor's question about the Vermont AG's involvement here, which I think is significant. One thing to bear in mind is that the Vermont AG, they were not just watching this from a distance. They did a special appearance in connection with the Dean settlement. They submitted an amicus brief. They asked for permission to review documents in the case, and in fact, at one point in the case, I sat down with them for a couple hours and walked through the documents in the case. So here you sort of have an unusual indicia of the reasonableness of the settlement and the injunctive relief, which is the Vermont AG's letter, which is at S.A. 1760. You have the New Hampshire Agricultural Committee, the senior officials there. You have the Vermont Agricultural Committee. And I would add also to that, Your Honor, the settlement was also submitted pursuant to CAFA, to the Department of Justice, and ten different Attorney General's offices, none of whom raised any objections about it. And I don't know how much weight one gives that under CAFA, but CAFA does set up a structure to allow those parties, those entities to raise any concerns, and no concerns were raised. So I would simply say in closing, Your Honor, I've been doing this for a long time for defendants and for plaintiffs. This was a terrific settlement in a very difficult case. We're proud of the settlement, and I think the district court acted entirely within its discretion in approving it. Thank you. Thank you, Mr. Pearson. CUNY? Good morning, Your Honors. May it please the Court, Stephen CUNY from Williams & Connolly for the DFA and DMS defendants. And let me try to pick up on a few points that were just raised. I do think the CAFA point is significant. The Vermont Attorney General didn't come out of nowhere. This is part of a federal statute to give antitrust enforcers in states that are within the territory affected a chance to participate and comment. And the fact that they not only did not object, but actually affirmatively embraced, and affirmatively embraced the injunctive relief provisions. They weren't really coming in to talk about whether the farmers got enough money. They described the injunctive relief as very consistent with the kind of remedy they would seek when they pursue an action as the state enforcers. The other point that was mentioned, but I think is worthy of maybe a little more attention, is the addition of an opt-out right in the second settlement, which was absent in the first settlement. And that was a concern to the district judge, and that's part of why, candidly, it appears in the second settlement. That seems to me to dramatically change how you react to people submitting claim forms for just the reason you were raising. If people have no option to get out, submitting a claim form is just a way of saying, well, if you're handing out money, I might as well take some. But when an opt-out right has been provided, so that if you are unhappy with what's going on, you now have an opportunity to choose continued litigation, then the people who submit claim forms and stay in have made a conscious choice along the lines that you were indicating. And therefore, that very high claims rate, I think, does become meaningful. I think all of the indicia of class participation in the settlement- The settlement has put an end to something, and now apparently you've still got a class action pending against you with these new, these opt-out plaintiffs. We have an individual action on behalf of the people who chose to opt out, and it was a difficult decision. And candidly, that's part of the reason it wasn't in the first go-round, because we felt that part of what you are buying as a defendant is peace. And if we weren't going to buy peace, then it had less value to us. Should we be troubled, though, by the thing that Mr. Haar emphasizes is that some of this, the letters of support were solicited by the defendants, and the defendants or defendants' representatives and defendants' representatives have considerable power over the farmers. This is something I've not encountered before. I've never seen, you know, the board of directors in a securities class action. Of course, they don't have it. Maybe they don't do it because they don't have any power over the shareholders. Go around and try to solicit support for a settlement from the plaintiffs. This gets back to what happened on round one. Okay, on round one of the settlement, Mr. Pearson correctly mentioned there was a serious issue about the release. There was an issue about the absence of an opt-out right. And there was a procedural issue about whether the settlement had been fairly negotiated. Because it was after the first settlement that the court provided, excuse me, two additional days of hearings about whether class counsel should be replaced because they had not done a faithful job for their clients during the settlement process. So in addition to two full day fairness hearings, there were two days of evidentiary hearing and argument about whether class counsel had adequately fulfilled their responsibilities. That two day hearing and the judge's ruling on that, I think, removed her concern about the process, which I think had been a, she described in that first opinion, rejecting the initial settlement, the process as a toss up. She certainly wasn't- She wanted additional class counsel. Yes. I mean, the end result of the, there were lots of motions filed not only to replace counsel, but to change the class representatives. And the court was very concerned about what was a transparent breakdown in communication, and was a frequent revelation of what should have been privileged material in the course of the dispute between the class members and the class lawyers. And I think she felt that in fulfilling her responsibilities to the class, and looking and exercising her duty as kind of a fiduciary for the absent class members, that the addition of some new faces who had not been mired in what had become an emotional and quite tense debate was in the class's best interest. And so she appointed those new class reps, and then basically gave us kind of one last 90 day time period to see if we could come to a meeting of the minds about the settlement. I guess there's a couple of other features about the settlement in terms of the adequacy of injunctive relief that I- be concerned about the DFA sending people who are essentially inspecting farms out to solicit proxies in favor of the settlement. That's a fair reminder, your honor. The other prong of the district court's opinion, which Mr. Pearson mentioned, was that she was not persuaded that absent class members were in favor of the settlement. Partly because she disputed the significance of the claim number in the absence of an opt-out right. And partly because the fairness hearing, not surprisingly, was almost a full day of people who were unhappy about the settlement. It was a small number, but she gave them all the time they wanted. And in my experience, as a defendant, you don't usually bring people in to say that the settlement's a good idea, because everyone assumes you think it's a good idea or you wouldn't have agreed to it. So the judge, nonetheless, did a bit of a nose count of who came to the first hearing. So seeing that, we want to respond on the release. We want to respond on the milk testing issue. We want to respond on her concern that absent class members are not in favor of the settlement. The reality is that it's easier for the people that have constant contact with the class members to say to them, look, you don't have to. Nothing's happened to the 117 people who opted out or the 200 people who filed objections. There's no string of acts of retribution, because we didn't do it. We made sure people didn't do it, and it's in the settlement that we're not going to do it, and no one's questioned that. But we said, look, if we can be a facilitator, if you think the case should be settled, the court seems concerned that she hasn't heard enough from the people that aren't there. If you feel like signing this letter, great. If you don't, great, and we move on. What's the ombudsman going to do? The ombudsman is really designed so that if one was going to look at any part of the record that you were given, I would really strongly recommend that you look at the fairness hearing transcript and read what the farmer said who came in to talk. What most of those farmers said is, the co-op works for me. It's an essential part of my being able to make a living in what is admittedly a very difficult way to make a living. But we understand that some people don't feel that way. They don't feel comfortable that they have access to a decision maker when they have a complaint. So let's put in place a new person, a neutral, part of the settlement to basically be a complaint mediation service for anybody who hasn't felt in the past that they've been able to do that with the cooperative. That's what the ombudsperson is essentially there for. They're a complaint recipient and a mediator, and the complaint can be about milk testing, it can be about your hauler, it can be about anything you want. And what you'll see in the testimony from the people who came in support of the settlement is that the new ombudsperson position was part of why they were enthusiastic about it and part of why we were enthusiastic about it. The co-op depends upon the trust and cooperation of the members. If adding the ombudsperson and this new advisory council member can help the people that haven't felt this comfortable historically, feel better about the co-op, that's a plus plus for everybody. And so this did become a situation where there's a suggestion that the dairy farmers basically just came in and said we're anxious to get this over with. That's true, but they also came in and said one of the positives about the new settlement is that it actually has the creation of these new positions that could be a net plus. That could make conditions for dairy farmers affirmatively better in a way that the old settlement didn't promise. And that realistically wouldn't be a litigated outcome either. It's hard to picture how at the end of a trial, a court would order something like an ombudsperson or this addition of a neutral outsider to the governing body of the Northeast Area Council. So the farmer presence is important, and I think last comment, I know I'm a little late. The judge's observation about seeing those more than 30 people who came to testify was an important reason why she was comfortable that this support for the settlement was not the product of coercion. But rather the product of strongly held beliefs by people who firmly believed not only that the co-op was a positive thing already, but that the settlement might help it be even better. Thank you, your honors. Thank you, Mr. Cooney. Mr. Harr. Yes, thank you very much. As with some trepidation that I addressed this honorable court. A couple quick points in rebuttal here, and try to wrap things up, thank you very much. I thought that was a fair framing of the question. Well, did the attorney's conduct represent a good faith determination in favor of the class? And what we've heard about the Sharon case, correct me if I'm wrong, but the distinction there is that procedural fairness was not such an issue in that case as it is here. Here you have on the docket where defendants are admitting, yeah, we collected letters in support from our employees, basically, which the plaintiff class is completely illegal. These people have the opportunity to put you out of business as a farmer, and that's simply- And you do not think that the district court, Judge Rice, Chief Judge Rice, addressed that issue or considered that issue? If you look at her decision, she devotes a whole paragraph to explaining about how the reaction of the class was overwhelmingly positive. There is one sentence with a brief reference to no credible evidence, to the contrary. But the fact of the matter is, with regards to that issue, it's not necessary to look at the in-camera filings to see the extent of this extortion. You have on the docket the references where defendants themselves, I refer you to letters 1281, letter 681, letter 2089, where people said this is a real problem, and those were the people willing to speak up. As my father said, that takes quite a bit of courage. So another- Those people, do we know, because I haven't gone back to figure out, do we know whether they're still pursuing individual causes of action? I don't believe that any of those is. Okay, thank you. So, the other issue too, with the conduct of the negotiations, this case, if you refer to the status hearing conference last September, docket 705, you have the district judge saying, I have never seen a case where the class council are going to the defendants to vet settlement proposals and then telling the class representatives, the defendants don't like this idea, so we're scrapping it on you guys.  So, that's fairly strong. I mean, if this is such a terrific settlement, why did the defendants feel the need to stack the deck by extorting signatures, by bringing up their delegates, board members, and affiliates to speak? I mean, Mr. Cooney just admitted, we brought people to that fairness hearing. That's stacking the deck. And the- There was actual opposition from most of the, certainly the named representatives, I remember very clearly, were distinctly opposed. And there was a lot of opposition more than here. So, even if we assume that there, we discount all those letters. The real problem, it seems to me, is in every litigation, there are going to be people who are disappointed with the outcome. Usually the people who are settling are not happy with the settlement. They wish they had more. The problem is, is this a reasonable settlement? And one of the things that I was moved by in the defense of the settlement was that some of the things that you folks are asking for are things that the lawyers thought A, could never have been gotten in a settlement because the defendant would never give in, and B, could not be gotten in a successful litigation even, as forms of relief. And so the question is, why do you think that some of the things that you wish you had gotten, quite understandably wish you had gotten, why do you think that those are things that could have been obtained if the litigation went to a conclusion? Well, because before the settlement money was on the table, the attorney specifically told us that, with regards to the strength of the case, that that's where we were targeted going. And the extent of the evidence, which is all in the record, shows a clear antitrust violation. And the law of the circuit is very clear on the need for relief of those. The one case we cited states specifically, antitrust matters are a primary public concern. So that being true, but I think if I can pick up on Judge Lynch's last line of questioning, is, again, why do you think that some of the things that were obtained were things that you could have done better than if you had pursued, or if the class had pursued litigation right through to the end? Well, because a lot of the reliefs in the settlement don't even touch on the central issue of the complaint. I mean, you have Fox guarding the hen house provisions, which deal with administrative matters, not antitrust relief. The sole provision, which touches on the antitrust issue, doesn't provide relief whatsoever. It's the full supply section 7.2A, if basically existing full supply agreements are okay to stay. No new ones, unless a new one is necessary. So essentially, there's nothing there, and it's hard to not do better than nothing. Okay, great, anything else that you want to add? No, sir, thank you very much. Thank you, thank you all. May we distribute this as my argument with the references to the documents? Yes, do you have enough copies for the- Yes. All right, okay, if you will give them, just hand them up to the clerk and he'll see that we get them. And this is the representation of the exhibit there, from the website, thank you. The larger ones, so they can be able to see it. Right. Hold it a second, I think that- Did you give them three copies? You will need extra copies there, yeah. Do you have three copies? Right. There we go, there, good, here, all right. Yes. Thank you. All right, thank you all. Obviously, we will observe decision on this and get you a decision in due course.